IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 02-30324
_____

THERESA J. FELTON,

Plaintiff-Appellant

versus

GREYHOUND LINES, INC.,

Defendant-Appellee

_____

Appeal from the United States District Court
For the Eastern District of Louisiana
_____

March 17, 2003

Before WIENER, BENAVIDES, and DENNIS, Circuit Judges.

WIENER, Circuit Judge:

Plaintiff-appellant Theresa J. Felton ("Felton") fell while attempting to get off a bus belonging to defendant-appellee Greyhound Lines, Inc. ("Greyhound"). She sued Greyhound in state court for her resulting damages. Greyhound removed the case to district court on grounds of diversity, after which the court granted Greyhound's motion for summary judgment and dismissed Felton's case. We reverse and remand.

I. Facts and Proceedings

Felton boarded a Greyhound bus in LaPlace, Louisiana to travel

to Shreveport, Louisiana.  At about 6:00 p.m., the bus stopped in Alexandria, Louisiana.  The bus driver got off immediately and left the vicinity of the bus.  Felton, an elderly woman, then tried to get off the bus by herself, but fell down the steps and broke her hip.  She underwent surgery on her hip and rehabilitation afterwards.  Felton initially testified in her deposition that she fell from the bottom step, but later testified, inconsistently, that she fell from the top step.

Felton sued Greyhound in Louisiana state court, alleging that Greyhound was liable in negligence for failing to provide a stool at the bottom of the steps and vicariously liable for the failure of its driver to position himself at the exit to assist her.  Greyhound removed the case to the district court, and then filed a motion for summary judgment.  Relying largely on Cary v. New Orleans Public Service, Inc.,[1] the district court granted that motion, holding that Greyhound neither had a duty to assist Felton, nor could it have been the cause-in-fact of Felton's injury because she fell from the top step of the bus.

## II. Analysis

### A. **Standard of Review**

In reviewing the district court's grant of summary judgment,

---

[1]250 So.2d 92 (La. Ct. App. 4th Cir. 1971).

we apply the same standard used by that court.[2]  Summary judgment is only proper if there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law.[3]  To determine whether there are any material factual issues, we must consult the applicable substantive law to define which issues are material, and then consider the evidence relevant to those issues in the light most favorable to the non-moving party.[4]

B. **Subject-Matter Jurisdiction**

As federal subject matter jurisdiction in this case is based on diversity of citizenship, Louisiana tort law governs the merits.[5]  Diversity jurisdiction requires (1) complete diversity of the parties and (2) an amount-in-controversy that exceeds $75,000.[6]  Complete diversity is obviously met here because Felton is a citizen of Louisiana and Greyhound is a Delaware Corporation with its principal place of business in Dallas, Texas.  Presence of the jurisdictional amount is less obvious.

Neither   the   parties   nor   the   trial   court   questioned

---

[2]<u>Harper v. Harris County, Texas</u>, 21 F.3d 597, 600 (5th Cir. 1994).

[3]Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).

[4]<u>Harper</u>, 21 F.3d at 600.

[5]28 U.S.C. § 1332 (2000).

[6]28 U.S.C. § 1332(a) (2000).

jurisdiction, but we are required to do so on our own. Whether the amount-in-controversy burden is met here is not completely clear, but is still likely under these facts. The uncertainty arises because Louisiana prohibits plaintiffs from claiming a specific dollar amount of damages. In De Aguilar v. Boeing Company, we held that "[w]hen the plaintiff's complaint does not allege a specific amount of damages, the removing defendant must prove by a preponderance of the evidence that the amount in controversy" is adequate.[7] To satisfy the preponderance standard, the removing defendant may support federal jurisdiction either by establishing that it is "facially apparent" that the claims probably exceed $75,000 or by establishing the facts in controversy in the removal petition or an accompanying affidavit to show that the amount-in-controversy is met.[8]

Applying this standard in Luckett v. Delta Airlines, Inc., we found that a complaint's allegations of property damage, travel expenses, emergency ambulance trip, six days in the hospital, pain and suffering, humiliation, and a temporary inability to do housework, (all because of heart failure after the airline lost her luggage, which contained her heart medication), combined to meet the jurisdictional requirement even though no amount of damages was

---

[7]De Aguilar v. Boeing Co., 11 F.3d 55, 58 (5th Cir. 1993).

[8]Simon v. Wal-Mart Stores, Inc., 193 F.3d 848, 850 (5th Cir. 1999) (citation omitted).

4

pled.[9]  By contrast, in <u>Simon v. Wal-Mart Stores, Inc.</u>, we held that damages comprising only an injured shoulder, bruises, abrasions, unidentified medical expenses, and loss of consortium did not meet the amount-in-controversy requirement.[10]  Finally, we have reiterated that removal "cannot be based simply upon conclusory allegations."[11]

In this case, Greyhound's Notice of Removal indicates that Felton "suffered severe debilitating injuries including a subtrochanteric fracture of the right hip requiring an open reduction and an internal fixation with a 75 millimeter lag screw and 140-degree six hole plate."  Greyhound also repeated from Felton's complaint that she was confined to a rehabilitation hospital after surgery.  Finally, Greyhound noted that Felton had incurred "over $40,000 in medical bills relating to this incident."  On the basis of these facts, Greyhound alleged that the amount in controversy "reasonably exceeds $75,000."

There is no indication when Felton's counsel advised Greyhound of the $40,000 in medical expenses, but it was likely after the suit had been commenced.  The accident occurred on February 18,

---

[9]<u>Luckett v. Delta Airlines, Inc.</u>, 171 F.3d 295, 298 (5th Cir. 1999).

[10]193 F.3d at 851.

[11]<u>Allen v. R&H Oil & Gas Co.</u>, 63 F.3d 1326, 1335 (5th Cir. 1995).

2000, and the complaint was filed on February 12, 2001, almost a year later. Given this lapse in time, we can reasonably conclude that the $40,000 figure includes the surgery undergone by Felton to mend her hip as well as some of the costs of rehabilitation, thereby making less certain the conclusion that plaintiff's expenses and equitable relief were greater than $75,000.

Nonetheless, in addition to compensation for a plaintiff's medical expenses and rehabilitation costs, his general and equitable relief automatically includes damages for pain and suffering.[12] Although the question remains close, when all of these items are calculated, it becomes more likely than not that the amount-in-controversy will exceed $75,000. Thus, there is subject matter jurisdiction here.

C. **Existence of a Legal Duty**

The law of negligence as it relates to common carriers is fairly well-settled in Louisiana and was correctly stated by the district court. Louisiana uses a duty/risk analysis, which requires that four elements be proved: (1) cause-in-fact, (2) existence of a legal duty, (3) breach of that duty, and (4) that "the risk, and harm caused, [were] within the scope of protection

---

[12]Wainwright v. Fontenot, 00-C-0492 (La. 10/17/00), 774 So. 2d 70, 74 (recognizing that general damages include pain and suffering).

afforded by the duty breached."[13]

In contrast to the basic duty of reasonable care ordinarily required, however, the duty imposed on common carriers toward passengers in Louisiana is "stringent".[14]  Because of this heightened duty to provide safe passage, the Louisiana Supreme Court has created a significant procedural advantage for plaintiffs by shifting the burden of proof to the common carrier defendant once the passenger plaintiff shows an injury.[15]  In Galland v. New Orleans Public Service, Inc., the court ruled that "the mere showing of injury to a fare-paying passenger on a public conveyance and his failure to reach his destination safely establishes a prima facie case of negligence and imposes the burden on the carrier of convincing by overcoming the prima facie case."[16]  This means, as Louisiana's highest court went on to explain, that the common carrier defendant has the burden to show either "that the incident had not occurred, or that the defendant had exercised reasonable care in discharging the plaintiff or that any negligence on its

---

[13]Roberts v. Benoit, 605 So. 2d 1032, 1041 (La. 1991).

[14]Amos v. St. Martin Parish Sch. Bd., 2000-808 (La. App. 3 Cir. 12/6/00), 773 So. 2d 300, 302.

[15]Galland v. New Orleans Pub. Serv., Inc., 377 So. 2d 84, 85 (La. 1979); Casborn v. New Orleans Pub. Serv., Inc., 448 So. 2d 176, 179 (La. Ct. App. 4th Cir. 1984).

[16]Galland, 377 So. 2d at 85.

part was not the legal cause of the plaintiff's mishap."[17]  It is also well-settled, however, that a common carrier is not the insurer of its passengers' safety.[18]

Galland instructs that the duty of the common carrier is so high that any showing of injury that occurs while the passenger is entering, traveling on, or getting off a bus creates a presumptive case of negligence.  Galland indicates further that the defendant must offer evidence to rebut the presumption that its behavior breached this duty of care.  The onus on the defendant is not so much to disprove the duty, but to show that, as a common carrier, it acted with sufficient care in spite of the occurrence of the injury.  Thus, whether a particular set of facts violates this heightened duty or remains outside the ambit of common carrier liability altogether depends on the discrete  facts and circumstances of the case and the extent of the exculpatory evidence produced by the defendant.

For instance, a Louisiana court ruled that the presence of, and failure to warn of, water tracked into the bus by passengers on a rainy day was not sufficient to breach the stringent common

---

[17]Id. at 85-86.

[18]Crear v. Nat'l Fire & Marine Ins. Co., 469 So. 2d 329, 334 (La. Ct. App. 2d Cir. 1985); Casborn, 448 So. 2d at 178 (stating that the "law does not today make the common carrier absolutely liable for its passengers' accidental injuries").

carrier duty.[19]  In contrast, a loose radiator screen that was dislodged by the impact of another automobile and hit a passenger was sufficient to constitute negligence on the part of the bus company.[20]  The same Louisiana court found that a bus company defendant had adequately exculpated itself when it adduced testimony from investigating police officers and bus company personnel that the allegedly offending steps at issue were not defective.[21]  Similarly, investigation and photographs of bus steps alleged to be defective were enough to rebut the prima facie case of negligence brought by the plaintiff.[22]

The district court in this case relied principally on <u>Cary v. New Orleans Public Service, Inc.</u> (finding it "strikingly similar" to this one) to conclude that Greyhound had no duty either to place a footstool at the bottom of the steps or to position a driver there to assist passengers in getting off the bus.[23]  In <u>Cary</u>, the

---

[19]<u>Casborn</u>, 448 So. 2d at 178.

[20]<u>Favorite v. Reg'l Transit Auth.</u>, 552 So. 2d 487, 489 (La. Ct. App. 4th Cir. 1989).

[21]<u>Whitehead v. New Orleans Pub. Serv., Inc.</u>, 442 So. 2d 802, 803 (La. Ct. App. 4th Cir. 1983); <u>Walton v. New Orleans Pub. Serv., Inc.</u>, 413 So. 2d 527, 528 (La. Ct. App. 4th Cir. 1982) (relying on the testimony of the bus driver and the claims investigator to exculpate defendant common carrier).

[22]<u>Duplessis v. New Orleans Pub. Serv. Inc.</u>, 396 So. 2d 449, 449-50 (La. Ct. App. 4th Cir. 1981).

[23]<u>Cary v. New Orleans Pub. Serv., Inc.</u>, 250 So. 2d 92, 93 (La. Ct. App. 4th Cir. 1971).

plaintiff was injured when she fell while attempting to step to the ground from the bottom step of the bus. Because the record in Cary showed that (1) no one else fell while exiting the bus, (2) there were no irregularities in the pavement, and (3) the plaintiff failed to request assistance, the defendant carrier was held to have met its burden of rebutting the presumption of negligence.[24] Thus, although the plaintiff had put forth a prima facie case of negligence by showing injury, the court found that the defendant had exculpated itself through the additional evidence it submitted.

Cary merely stands for the proposition, however, that a bus driver has no duty to assist a passenger to get off a bus when there is no obstacle in the passenger's way and that passenger does not request help. As the court itself stated, because the plaintiff had not requested assistance, it "perceive[d] no duty under the circumstances on the part of the defendant to aid her."[25] The court also suggested that the company could not have had a duty because the passenger had no obvious manifestation of needing assistance.[26] On the strength of Cary, the district court here found that there was no authority for the proposition that the

---

[24]Id. at 93-94.

[25]Id. at 94.

[26]Id. (stating that plaintiff showed no physical disability despite advanced age and that there were no other reasons for the bus driver "to suspect that plaintiff might need special assistance in descending the steps prior to her fall").

10

heightened duty of a common carrier included the more specific duty of providing a step stool or having a driver at the door to assist passengers.

The absence of precedent to support these particular manifestations of the carrier's duty, however, does not equate with the absence of duty. The case law is clear that common carriers maintain a stringent and heightened duty to care for their passengers. Once injury is demonstrated, the burden is on the defendant carrier to show that, irrespective of the occurrence of an injury, the carrier had exercised reasonable care. Although the Cary court couched its conclusion in terms of the bus company's legal duty, Galland and subsequent Louisiana cases have indicated that the carrier's burden is to show that it acted in a way that meets its heightened duty rather than to attempt to restrict the scope of legal duty.[27]

Even at a factual level, this case is distinguishable from Cary. True, the record here, as in Cary, suggests that others had alighted without difficulty and that there was nothing obstructive on the ground outside the bus, as Felton herself indicated; but the similarities end there. In contrast to Cary, although Felton

---

[27]See, e.g.,Casborn, 448 So. 2d at 179 (finding that the common carrier "bears the burden of proof that the injury was not a result of the carrier's breach"); Whitehead, 442 So. 2d at 803 (finding that the carrier had exculpated itself from prima facie liability because it produced evidence showing that the bus steps were not defective).

11

testified that the ground next to the exit was concrete, the summary judgment record does not reflect the precise conditions of the aisle or steps of the bus.[28]

In addition, the record in this case reflects that Felton had no opportunity to ask the driver for assistance because he had exited and departed the area as soon as he parked the bus at the stop in Alexandria.  If ultimately proved, this latter fact will further distinguish Felton's case from Cary, and will support her assertion that the driver violated a provision of his safety manual.  Thus, even if it were proved that Felton fell from the top step of the bus, and that there were no unsafe conditions of the ground below, Greyhound "has the burden of proving that not even the slightest evidence of negligence existed."[29]  The allegation that the driver left his post in violation of Greyhound's own manual and was thus unavailable to be asked for assistance by Felton, an obviously elderly passenger who was likely to need assistance, indicates potential driver negligence, even under Cary.

_____

[28]Although counsel specifically asked Felton if she stepped on something or if something got in the way, and she responded negatively, she followed up her negative answer with a description of the ground outside the bus.  In answering counsel's question about obstructions, she stated "No.  It looked like it was concrete allover that-a-way, and the bus, you know, stopped on the side there."  This answer suggests that Felton thought counsel was asking about the pavement outside the bus, not the condition of the steps of the bus.

[29]Favorite, 552 So. 2d at 489.

12

Although the general heightened duty of common carriers should be adequate to apply to all situations in which injury occurs, there is specific precedent, contrary to the conclusion of the district court, that bolsters the finding of a duty here. First, Louisiana decisions demonstrate that this heightened duty includes the duty to assist particular passengers, either when the passenger requests help or when it should be evident to the bus driver from the passenger's appearance that he requires assistance. Cary itself suggested that if the plaintiff had requested help, the driver would have had the duty to assist her.[30] And, if the appearance of the passenger makes it apparent that he is physically limited, failing to help can constitute negligence.[31] The driver's allegedly hasty departure would make it impossible for Felton to request assistance; and her physical appearance of advanced age or infirmity might well have been sufficient to put the driver on notice that she would likely need help leaving the bus, had he stayed around long enough to allow observation.

Second, although by itself neither the presence nor absence of a safety manual provision can establish or preclude the existence

---

[30]See Cary, 250 So. 2d at 94.

[31]See Willis v. Reg'l Transit Auth., 95-CA-2350 (La. App. 4 Cir. 3/27/96), 672 So. 2d 1013, 1015 (finding no duty for a bus driver to wait until a passenger is seated "unless there is something about the appearance of the passenger that makes it apparent that the passenger has [physical or age-related] limitations.").

13

of a legal duty, Louisiana case law suggests that the presence of a safety provision can <u>confirm</u> a duty. Neither the parties nor our own research have revealed common carrier cases that implicate safety manual violations. Nonetheless, in <u>Pinsonneault v. Merchants & Farmers Bank & Trust Co.</u>, a Louisiana court of appeal considered whether a bank had a duty to protect customers from assault.[32] Instead of simply relying on a presumed general duty to protect, the court found the existence of such a duty based on the bank's own written plan to protect its patrons while they were doing business at the bank.[33] Similarly, those provisions in Greyhound's manual that require drivers to assist passengers appear to be aimed at the same purpose as the bank's safety rules, i.e., to protect business invitees from injury or harm. In short, <u>Pinsonneault</u> indicates that, at a minimum, Greyhound's rules confirm the finding of a duty in this instance.[34]        In sum, the

---

[32]99-12 (La. App. 3 Cir. 7/21/99), 738 So. 2d 172, 186.

[33]<u>See</u> <u>id.</u> Another purpose of the bank's safety procedures apparently was to comply with provisions of the Federal Deposit Insurance Corporation Regulations. This additional purpose, however, was not emphasized by the court in its finding of duty, nor did it appear to be the primary reason for the bank's security program. <u>Id.</u> As a result, whether the relevant Greyhound safety manual provisions respond to similar regulations (a question that might be answered at trial) is immaterial to the support these provisions give to the finding of a duty here.

[34]Although we generally have rejected the contention that safety manual provisions create some duty of care, most of those cases addressed whether a company's internal safety manual applies to a separate contract with an independent contractor; <u>Graham v.</u>

14

absence of duty in <u>Cary</u> was limited, as the court itself explained, to the particular circumstances of that case. This case differs because (1) it is not clear that the aisle and steps were free from obstruction, (2) the driver's precipitous departure deprived Felton of the opportunity to ask him for assistance, (3) the driver's precipitous departure also deprived him of an opportunity to observe Felton's condition, and (4) the driver allegedly violated a safety manual provision. As a result, this case falls squarely within the heightened duty of common carries to transport and discharge their passengers safely. The Louisiana Supreme Court has indicated that this duty applies broadly and is invoked by the occurrence of an injury. It is further supported by the duty to help those who request it or are in obvious need of it, as well as by Greyhound's own safety rules. Thus, having confirmed a duty in this instance, summary judgment would be appropriate only if the defendant common carrier were able to show that no genuine issue of

<u>Amoco Oil Co.</u>, 21 F.3d 643, 647-48 (5th Cir. 1994); or whether operational safety provisions extended to federal government contracts with independent contractors or business invitees under the Federal Tort Claims Act. <u>LeSuer v. United States</u>, 617 F.2d 1197, 1199 (5th Cir. 1980); <u>Market Ins. Co. v. United States</u>, 415 F.2d 459, 463-64 (5th Cir. 1969). We also have rejected the link between a safety manual and a duty when the risk from which an injury occurs differs from the risk that a safety manual is aimed at mitigating. <u>See</u> <u>Ellison v. Conoco, Inc.</u>, 950 F.2d 1196, 1205 (5th Cir. 1992). In contrast, here there appears to be an alignment of risks, which distinguishes this case and perhaps further supports the connection between a safety manual provision and a legal duty.

15

material fact exists as to whether it acted in accordance with this elevated standard of care, whether its actions were the cause-in-fact of Felton's injury, and whether they were the proximate cause of that injury.

D. **Remaining Elements of Duty-Risk Analysis**

Given the existence of the common carrier's duty in this case, the relevant questions become whether the driver breached this heightened duty, and whether that breach was the cause-in-fact and proximate cause of the plaintiff's injuries. The district court's ruling on the element of duty precluded consideration of the element of breach. The court also found, as a matter of fact, on the basis of deposition testimony, that Felton fell from the top step, and thus concluded that Greyhound's failure to provide assistance could not be the cause-in-fact of her injuries. The making of any factual finding at the summary judgment phase of a case can be problematic, particularly when, as here, the witness's testimony on that point is inconsistent.

We need not establish each of these elements ourselves to conclude that the district court improvidently granted summary judgment in favor of Greyhound. Under our *de novo* review, three factors cause us to disfavor summary judgment in this case. First, Felton's showing of an injury makes it incumbent on the defendant common carrier, Greyhound, to exculpate itself from even the

16

slightest negligence.  Second, the summary judgment posture of this case signals that all factual issues must be viewed in the light most favorable to Felton as the nonmovant.  Third, the remaining elements of this tort claim are factual in character, and thus normally subject to consideration by a fact-finder:  The presence of unresolved issues of material fact make the grant of summary judgment inappropriate.

The trial court concluded that Felton fell from the top step of the bus despite Felton's ambiguous testimony.  Although the trial court may ultimately be proved correct, the record is not yet clear.  Felton testified inconsistently in her deposition that she fell from the top and bottom steps.  Her statement that she fell from the top step appears to clarify her position on the issue, but her initial remark still leaves some ambiguity.  Her testimony about the state of the aisle and steps is also unclear.  Indeed, the only fact conclusively determined by her deposition testimony is that there was nothing irregular about the ground at the bottom of the steps; and such evidence alone does not preclude the possibility that there was an obstruction on the bus floor or steps themselves, or that her age and condition were such that assistance was required, regardless of the condition of the aisle and steps. Finally, Felton alleges that the bus driver vanished from the scene before Felton could attempt to step off the bus.  Greyhound does

17

nothing to disprove this allegation, or to indicate that, despite her advanced age, there was nothing about Felton's appearance that should have prompted the driver to offer to assist her had he remained at his station.

Furthermore, even if Felton fell from the top step rather than the bottom step, a question that witnesses might have been able to clear up at trial, that fact alone does not preclude the finding of cause-in-fact. A driver stationed at the exit could have cautioned her to be careful, as his safety rules commanded, could have extended a steadying hand, and could even have helped break her fall and thereby prevented such serious injury.

Finally, the existence of the safety rules themselves indicate that Felton's accident was foreseeable to Greyhound and the bus driver. A written rule requiring a driver to stand at the door of the bus to help passengers get off would preclude any argument on Greyhound's part that this type of accident was outside the scope of foreseeable risks. Indeed, the safety manual provision at issue is squarely applicable to the risk that eventually led to Felton's injury. The Greyhound Rule Book provides that "Drivers will station themselves at the door and assist passengers in boarding and alighting, and shall caution them with the words, 'Please watch your step.'" Such language is obviously aimed at preventing passengers from stumbling down the steps of the bus, which is

18

exactly what Felton did, regardless of whether she fell from the top step or the bottom one.

The record at summary judgment fails to answer these questions, leaving several issues of material fact to be determined at trial. The record states that Felton planned to call the driver to the stand. Although he was deposed, nothing in the record indicates that he discussed his behavior once he parked the bus in Alexandria. Felton also intended to call eye witnesses to the accident to shed more light on the details. Greyhound planned to submit its incident report from the accident and to call the driver and any passenger-witnesses to testify. All of these parties and exhibits would have provided a much clearer and more complete picture -- likely a definitive one —— of the material facts surrounding Felton's injury. It is at least conceivable that all available testimony would still have been insufficient to overcome the fact that the driver was unavailable to help, but it is also possible that Greyhound could met its evidentiary burden to show that, regardless of Felton's fall, neither it nor its driver was negligent.

In sum, the evidence offered at the summary judgment stage fails to meet Greyhound's burden of proving that it was free of all negligence, even slight. There are still unresolved factual issues, such as the condition of the bus aisle and steps, whether Ms. Felton had obviously noticeable impairments, and whether the driver had an

opportunity to observe her before leaving the bus, to name just a few that would help determine whether Greyhound was indeed negligent and thus liable, or had met its heightened duty of care and thus was not liable.

### III. Conclusion

For the foregoing reasons, the summary judgment in favor of Greyhound is reversed and this case is remanded to the district court for further proceedings consistent with this opinion.

REVERSED and REMANDED.